USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/18/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                        :
GREGORY PAPPAS,                            :

                                 Plaintiff,   :          1:19-cv-11137-GHW
                                                        :
        -against-                       :           MEMORANDUM
                                                        :       OPINION AND ORDER
XP CONTROLE PARTICIPAÇÕES S.A.,    :
                                                        :
                                   Defendant.  :
                                                        :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      The question "who do you work for?" used to be a simple one. As recently as a couple of decades ago, most people not only knew their direct boss, but also the owner of the place where they clocked in and out daily. So if you believed your employer broke the law, it wasn't difficult to point the finger at the people responsible.

      But for many, globalization and the forces of the modern economy have changed all that. Parent companies, subsidiaries, subsidiaries-of-subsidiaries, and so on can make it hard to discern who, exactly, is responsible for a given entity's employment decisions—or, as often matters in court, where the buck stops when it comes to bad behavior.

      This case reflects that difficulty. Plaintiff Gregory Pappas was hired by a US-based company, XP Investments US, LLC ("XP US"), to work as a securities broker in New York City. And XP US terminated him two years later for what he alleges were discriminatory reasons. But Pappas, for technical reasons, cannot sue XP US in this Court. So instead, he brings his case against the Brazilian holding company that, he says, worked with XP US to end his employment. And that company, XP Controle Participações S.A. ("XP Brazil"), responds by contesting both the merits of Pappas's discrimination claims and the idea that it can be held responsible for his firing at all.

Because Pappas has pleaded sufficient facts to plausibly allege that XP Brazil was his joint employer, and has also sufficiently stated his discrimination claim on the merits, XP Brazil's motion to dismiss is DENIED.

## I. BACKGROUND

### A. Facts[1]

In April 2016, XP US hired Plaintiff Gregory Pappas to work as a securities broker in New York City. Dkt. No. 48, Second Amended Complaint ("SAC") ¶ 18. XP US is a subsidiary of XP Investimentos CCTVM S.A. ("XPI"), which is itself controlled by Brazil-based holding company XP Brazil. *Id.* ¶ 3. When Pappas was hired by XP US, he was offered a right—which he exercised—to purchase shares in XP Brazil. *Id.* ¶¶ 20–21. Pappas believes that his hiring was decided by XP US and XP Brazil jointly. *Id.* ¶ 19.

Pappas was a productive broker for nearly two years, and worked without incident until March 2018. *Id.* ¶¶ 22–24. The week of March 12, 2018, however, a group of XP Brazil managing agents, described to Pappas as "senior management," came to visit the XP US offices in New York. *Id.* ¶ 28. Daniel Lemos, a senior managing agent of XP Brazil and Chief Operating Officer of XPI, was among the XP Brazil senior management conducting the visit; while at XP US, he observed Pappas at work. *Id.* ¶¶ 12, 29. Afterwards, he engaged in "extensive discussions about his impressions of Pappas" with various senior officers of XP US and XP Brazil, including head of XP US's equities desk Caio Azevedo. *Id.* ¶ 29. Pappas alleges that, as a result of those discussions, he was terminated by XP US on March 29, 2018. *Id.* ¶ 30. Pappas claims either that XP Brazil

---

[1] Unless otherwise noted, the facts are taken from the complaint and are accepted as true for the purposes of this motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"directed XP [US] to terminate [his] employment" or that "[t]he decision to terminate [his] employment was co-determined by XP [US] and [XP Brazil]." *Id.* ¶¶ 31–32.

When Pappas was terminated, XP US had a regulatory obligation imposed by the Financial Industry Regulatory Authority ("FINRA") to file a "Form U5," which includes a section headed "Termination Explanation." *Id.* ¶¶ 33–36. In that section, Pappas alleges, XP US stated: "Mr. Pappas was terminated because he was not aligned with the company's culture. Termination was not related to performance or customer related issues." *Id.* ¶ 36.

According to Pappas, this culture-based explanation for his firing was code for the real reason he was terminated—discrimination based on his age and national origin. *Id.* ¶ 38. Pappas, an American national who was 52 years old when fired, was the oldest broker on his brokerage desk— the average age of the other brokers was around 37. *Id.* ¶¶ 1, 27. Pappas was one of only five American nationals working there; the other nine brokers were Latin American and six of those nine were Brazilian. *Id.* ¶¶ 1, 25–26. In that context, Pappas alleges, the cultural difference pointed to on the Form U5 is suggestive of national-origin-based or age-based discrimination. *Id.* ¶ 40.

In contrast with what XP US wrote on the Form U5, XP US and XP Brazil later stated to the Equal Employment Opportunity Commission (the "EEOC") that Pappas was terminated for performance-related reasons, including that he watched entertainment videos during business hours, lacked professionalism, and had a poor work ethic. *Id.* ¶¶ 41–42. Pappas alleges that younger Latin American brokers also watched videos during work hours but were not terminated or disciplined for doing so. *Id.* ¶ 43. After Pappas was terminated, XP Brazil repurchased his shares in XP Brazil at what was, for Pappas, a disadvantageous price. *Id.* ¶ 44.

**B. Procedural History**

Pappas filed his original complaint against both XP US and XP Brazil in December 2019. Dkt. No. 1. He amended that complaint in January 2020. Dkt. No. 9. The case was reassigned

3

from Judge Alison Nathan to Judge Woods on April 11, 2022. Because a forum-selection clause in Pappas's employment contract precluded suit against XP US in this district, the sole cause of action against XP US was transferred to the Southern District of Florida on June 23, 2022. Dkt. No. 47. A week later, Pappas filed his second amended complaint—the active complaint here—against XP Brazil only. Dkt. No. 48.

On July 28, 2022, XP Brazil moved to dismiss that complaint in full. Dkt. No. 53 (motion), Dkt. No. 54 (memorandum of law in support, or "Def's Mem."). It argued that XP Brazil could not be sued under the New York City Human Rights Law (the "NYCHRL") because under that statute, it was neither Pappas's employer nor had it aided or abetted Pappas's firing. Def's Mem. at 8–12, 20. It further argued that, even if XP Brazil was subject to suit, Pappas's discrimination claim was insufficiently pleaded and sought improper damages. *Id.* at 12–21. Pappas filed his opposition on August 18, 2022. Dkt. No. 57 ("Pl's Opp."). XP Brazil replied on August 25, 2022. Dkt. No. 58 ("Reply").

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). In that context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

**III.    DISCUSSION**

At this stage, Pappas has pleaded sufficient facts to plausibly allege that XP Brazil was his joint employer such that it can be sued under the NYCHRL.[2] His complaint also meets the low bar set by the NYCHRL to state a discrimination claim. Accordingly, his claims against XP Brazil will not be dismissed.

### A.    Pappas Has Plausibly Alleged That XP Brazil Was His Joint Employer Under the NYCHRL

Pappas has plausibly alleged that XP Brazil was his employer such that they are subject to suit under the NYCHRL. Under the NYCHRL, it is unlawful "[f]or an employer" to discriminate in terms or conditions of employment because of—as relevant here—a person's national origin or age. N.Y.C. Admin. Code § 8-107(1)(a). As that text indicates, "[f]or a corporate defendant to be liable for alleged discrimination under the NYCHRL, the defendant must qualify as the plaintiff's 'employer,' as defined by the statute." *Franklin v. Vertex Glob. Sols., Inc.*, No. 20-cv-10495, 2022 WL 392913, at *9 (S.D.N.Y. Feb. 9, 2022). Pappas directly worked for XP US, not XP Brazil. *See* SAC ¶ 18. But "[a] corporate defendant need not be a plaintiff's direct employer for liability to flow under the NYCHRL." *Id.* And here, Pappas alleges that XP Brazil's control over XP US made it his joint employer under the NYCHRL. *See* SAC ¶¶ 7–11.

A "joint employer relationship" exists "when two or more entities, according to common law principles, share significant control of the same employee." *Felder v. United States Tennis Assn.*, 27

---

[2] Pappas's complaint brings two causes of action for direct discrimination by XP Brazil—premised on the theory that it was his joint employer—and two causes of action against XP Brazil for aiding or abetting XP US's discrimination. *See* SAC ¶¶ 45–70. In his opposition papers, Pappas explains that these theories of liability are brought in the alternative: "[I]n the first instance," he claims "that [XP Brazil] sufficiently controlled his terms and conditions of employment to qualify as being his employer"; only "if [XP Brazil] is not ultimately found to have had sufficient control to qualify as his employer" does Pappas predicate liability on XP Brazil's aiding and abetting of XP US's discrimination. Pl's Opp. at 20. For the reasons explained below, the Court finds that Pappas's primary theory of liability against XP Brazil—that it was his joint employer—is sufficiently pleaded. *See* Part III(A), *infra*. The Court will therefore allow all of Pappas's claims to proceed, understanding that Pappas will deal with these alternate theories (and the causes of action based on them) at a later time, subject to what is learned in discovery about XP Brazil's relationship with XP US. And XP Brazil's motion to dismiss is, accordingly, denied without prejudice now as to the aiding-and-abetting causes of action in Pappas's complaint (counts three and four), subject to renewal at a later stage of the case.

F.4th 834, 843 (2d Cir. 2022) (emphasis removed). "This means that an entity other than the employee's formal employer" is that employee's joint employer when it "has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists." *Id.* at 844. While "any 'relevant factor [ ] may . . . be considered so long as [it is] drawn from the common law of agency,'" "the exercise of control is the guiding indicator." *Id.* (quoting *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000)) (alterations in original).[3]

Under *Felder*, Pappas has adequately pleaded that XP Brazil was his joint employer. He alleges that XP Brazil (1) jointly hired Pappas with XP US, SAC ¶ 19, (2) induced Pappas to accept the job by granting him a future right to purchase shares in XP Brazil, *id.* ¶ 20, (3) sent senior management to visit XP US's offices in New York to evaluate employees, including Pappas, *id.* ¶¶ 28–29, and (4) directed XP US (or worked with XP US) to fire Pappas, *id.* ¶¶ 31–32.[4] Taken together, these allegations plausibly allege that XP Brazil had the "power to pay [Pappas's] salary, hire, fire, or otherwise control the employee's daily employment activities" such that it was his joint employer. *Felder*, 27 F. 4th at 844.[5]

---

[3] While *Felder* concerned a Title VII claim, the joint-employer test it articulated applies under the NYCHRL also. *See Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 321 (S.D.N.Y. 2020) (noting that employer-employee tests from Title VII are applied to the New York State Human Rights Law (the "NYSHRL") and the NYCHRL). Moreover, because—for the reasons explained below—Pappas has plausibly pleaded that XP Brazil was his joint employer under a straightforward application of *Felder*, the Court need not address Pappas's argument that the *Felder* test should be applied particularly liberally to NYCHRL claims. *See* Pl's Opp. at 13–14; *see also* N.Y.C. Admin. Code § 8-130(a) (noting that the NYCHRL's "provisions" should "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof").

[4] Pappas also asserts, toward the beginning of his complaint, that XP US "has at all relevant times been directly or indirectly subject to [XP Brazil's] operational oversight and control," that "[a]t all times relevant herein, [XP Brazil] . . . determined and exercised control over Pappas's employment terms, status, responsibilities, and authority," and "exercised its control of XP [US] to direct the firing of Pappas from XP [US]," that XP US and XP Brazil "conducted themselves in connection with Pappas's employment as his joint employers," and that XP Brazil "was an 'employer' of Pappas's within the meaning of the NYCHRL." SAC ¶¶ 7–11. Because these represent "legal conclusions," rather than pleaded facts, that do not add to allegations in Pappas's complaint. *See Iqbal*, 556 U.S. at 678.

[5] Defendant argues that Pappas's allegation that he was jointly hired by XP US and XP Brazil should be given no weight because it was "blithely assert[ed] on information and belief." Def's Mem. at 10 (quotation marks omitted). But a plaintiff may "plead facts on information and belief 'where the facts are particularly within the possession and control of the defendant.'" *McHenry v. Fox News Network*, 510 F. Supp. 3d 51, 70 n.9 (S.D.N.Y. 2020) (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)). Here, despite Defendant's contention that Pappas is "well-situated to allege the

It is true that Pappas's complaint focuses primarily on XP Brazil's role in his hiring and firing, not on XP Brazil's control of his employment conditions.  But Pappas's specific allegations about the run-up to his firing—that "[d]uring the week of March 12, 2018, a group of managing agents of [XP Brazil] led by Lemos, and described by XP [US] and [XP Brazil] as 'senior management,' visited XP [US]'s New York office," that "Lemos, after observing Pappas, had extensive discussions about his impressions of Pappas" with XP US and XP Brazil senior leadership, and that "[a]s a result of those discussions . . . Pappas's employment was terminated" jointly by XP US and XP Brazil, SAC ¶¶ 28–32—suggest that XP Brazil had the power to control the terms and conditions of employment for Pappas and other employees at XP US.  And as both *Felder* and the general common law of agency that it drew upon recognize, the ability to significantly control an employee's employment—even if that control is not constantly exercised—can create an employment relationship.  *See Felder*, 27 F. 4th at 844 (finding a joint employer exists where "an entity other than the employee's formal employer has power" to control an employee); Restatement (Second) of Agency § 220 (1958) cmt. d ("Although control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated."); *see also Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.").

Other courts have likewise recognized that a pleading need not touch on all elements of an employment relationship in order to survive a motion to dismiss.  For instance, in *Brown v. Daikin*

---

nature and extent of control that XP Brazil and XP US would have exercised over his employment," Reply at 5, there is nothing to indicate that Pappas would have or should have known exactly what role XP Brazil played in his hiring.  And unlike *McHenry*, where statements about hiring and firing based solely on information and belief were rejected as conclusory, *see* 510 F. Supp. 3d at 82, Pappas's pleaded facts about XP Brazil's involvement in his firing give rise to a reasonable inference that XP Brazil was involved his hiring also.  *See* SAC ¶¶ 28–32.

8

*America*, 756 F.3d 219 (2d Cir. 2014), the Second Circuit examined a plaintiff's complaint that "d[id] not allege that [the parent company] participated in the decision to hire him or expressly directed [the subsidiary] to end his employment. Nor, for that matter, d[id] he allege common management." 756 F.3d at 228.[6] Nonetheless, the plaintiff successfully pleaded an employment relationship between himself and the parent company because other facts in the complaint—including that the parent company had to approve all significant decisions of the subsidiary—plausibly alleged "the control" by the parent company "over [the subsidiary's] employment actions" "adequate to sustain the action." *Id.*, *compare, e.g.*, *Yeremis v. Charter Commcn's Inc.*, No. 20-cv-4723, 2021 WL 5910396, at *5–6 (S.D.N.Y. Dec. 13, 2021) (finding no joint employer relationship where the plaintiff made no allegations about a "shared hiring process," "d[id] not allege that [the purported joint employer] was involved in the decision to fire him," "d[id] not allege that [the purported joint employer] had control over his hours, pay, insurance, records, or discipline," and did not describe any supervision by the purported joint employer over him); *Gonzalez v. City of New York*, No. 15-cv-3158, 2015 WL 9450599, at *3 (E.D.N.Y. Dec. 22, 2015) (finding no joint employer relationship where "Plaintiff's allegations regarding [ ] joint employment are entirely conclusory and consist only of a recitation of the legal standard").

As explained, Pappas's complaint does enough—through its specific allegations that XP Brazil had the authority to, and did, observe and evaluate Pappas's performance, and then

---

[6] *Brown* involved a claim that a parent company and subsidiary were a single employer, as opposed to joint employers, of a certain employee. *See* 756 F.3d at 226. The case is nonetheless instructive here because both the single-employer and joint-employer tests turn on the control exercised by the parent company over the employment actions of the subsidiary, and both tests draw on similar agency principles to determine employment relationships. *See id.* at 226 (noting that, in the single-employer context, "[i]n essence, a court must consider whether 'an employee, formally employed by one entity, . . . has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity'" (quoting *Arculeo v. On–Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 198 (2d Cir. 2005))); *Felder*, 27 F. 4th at 844 (finding that a where "an entity other than the employee's formal employer has power to pay an employee's salary, hire, fire, or otherwise control the employee's daily employment activities, such that we may properly conclude that a constructive employer-employee relationship exists," that entity is the employee's joint employer).

coordinated with XP US to fire him—for the Court to reasonably infer that XP Brazil could exercise significant control over the employees at XP US. Accordingly, Pappas's complaint has plausibly pleaded that XP Brazil was Pappas's joint employer such that it can be subject to liability under the NYCHRL.

### B. Pappas's NYCHRL Discrimination Claim is Plausibly Pleaded

Having plausibly established the XP Brazil was Pappas's joint employer, Pappas has also plausibly pleaded that he was subject to discrimination within the meaning of that statute. Section 8-107(1) of the NYCHRL makes it "an unlawful discriminatory practice" in New York City "[f]or an employer . . . because of the actual or perceived age [or] . . . national origin . . . of any person . . . [t]o discharge from employment such person." N.Y.C. Admin. Code § 8-107(1). To succeed on a motion to dismiss under the NYCHRL, a plaintiff must plausibly allege that he "has been treated less well at least in part because of [his protected characteristic]." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (emphasis and internal citation omitted).[7]

The NYCHRL also provides that its "provisions" "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof," regardless of how comparable provisions of similar statutes are construed. *Id.* § 8-130(a). Under New York law, accordingly, the NYCHRL's language must be construed "broadly in favor of discrimination

---

[7] XP Brazil argues that "[t]o assert a plausible claim of discrimination under the NYCHRL, a plaintiff must allege that: '(1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination.'" Def's Mem. at 12 (quoting *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010)). But *Mihalik*, decided three years after *Spiegel*, recognized that—based on New York courts' interpretation of the NYCHRL's broad remedial purpose—the standard to plead discrimination under the NYCHRL was simply that a plaintiff must show he has been treated less well because of a protected characteristic. *See Mihalik*, 715 F.3d at 110. And the Second Circuit has indicated that the standard articulated in *Mihalik*, though applied only to a hostile-workplace-environment claim in that case, applies to *all* discrimination claims under the NYCHRL. *See De La Fuente v. Sherry Netherland, Inc.*, 845 F. App'x 29, 33 (2d Cir. 2021) (summary order) (citing *Mihalik*, in a traditional discrimination case, as "holding that to succeed on an NYCHRL claim, a plaintiff must establish that he has been treated less well at least in part because of his membership in a protected class" (internal quotations omitted)). In any event, because there is no dispute that Pappas was within a protected class, that he was qualified for his position, and that he was subject to an adverse employment action, his case comes down to the same element under either standard—whether he has raised an inference that he was subjected to discrimination because of his national origin or age.

plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of New York*, 16 N.Y. 3d 472, 477–78 (2011)).  In other words, the NYCHRL "provides even greater protection against disability-based discrimination" than do the New York State Human Rights Law (the "NYSHRL") and Title VII. *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y. 3d 824, 833–34 (2014).  And at the motion-to-dismiss stage, even those statutes require only that a plaintiff "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation" as the reason that an employer treated the plaintiff less well than others. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Pappas has met the NYCHRL's low pleading burden.  He alleges that, after meeting with XP Brazil executives and terminating Pappas, XP US stated on its required Form U5 that: "Mr. Pappas was terminated because he was not aligned with the company's culture.  Termination was not related to performance or customer related issues." SAC ¶ 36.  He further alleges that, in a subsequent EEOC filing, XP US and XP Brazil changed their story—asserting "alleged performance deficiencies"—including "watch[ing] entertainment videos on his computer screen . . . lack[ing] professionalism, and ha[ving] a [poor] work ethic"—as the "purported reasons for [Pappas's] termination." *Id.* ¶¶ 41–42.  In other words, Pappas's theory is that the "cultural" explanation provided on the Form U5 was code for an age-related and national-origin-related termination, and that XP US and XP Brazil then attempted to offer a facially neutral justification to the EEOC as a cover for this discrimination.  *See id.* ¶ 40; Pl's Opp. at 16–17.

That theory is plausible, which means that Pappas's complaint is sufficiently pleaded.  To be sure, "culture" has multiple common meanings, only some of which have to do with national origin or age. *Compare Culture*, Merriam-Webster Dictionary (Online Ed. 2023) at 1a ("[T]he customary beliefs, social forms, and material traits of a *racial,* religious, or social group." (emphasis added)), *with id.* at 1b ("[T]he set of shared attitudes, values, goals, and practices that characterizes an institution

11

or organization."). Based on this "panoply of interpretations," XP Brazil suggests that no inference of discrimination can arise from the use of the word "culture" on the Form U5—that each interpretation is "no more or no less conceivable than the rest." Reply at 6.

But XP US's and XP Brazil's shifting explanations lend Pappas's theory plausibility. A plaintiff can support his theory of discriminatory discharge "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). Here, Pappas has pointed to what appears to be a basic inconsistency in XP US and XP Brazil's story concerning whether performance issues were the reason for his termination. *Compare* SAC ¶ 36 (Pappas alleging that the Form U5 stated that "[t]ermination was not related to performance or customer related issues"), *with id.* ¶ 42 (Pappas alleging that XP US and XP Brazil cited performance issues to the EEOC as justification for his termination).

That alleged inconsistency, coupled with the "culture" comment on the Form U5, is enough to sustain Pappas's claim.[8] XP Brazil argues that while inconsistent explanations may matter at the summary-judgment stage—where a plaintiff is tasked with undermining a defendant's claimed nondiscriminatory rationale for termination—they have "no application to whether a plausible claim of discrimination has been alleged in the first instance." Reply at 7 n.5. But that suggested distinction makes little logical sense, because an inconsistency in an employer's story creates reason to doubt the accuracy of its explanation for adverse actions taken against an employee—and thus necessarily makes other explanations, including discriminatory ones, more plausible. As applied

---

[8] Because the Court finds that the combination of the statement on the Form U5 and the comments made to the EEOC sufficiently suggest an inference of discriminatory motivation in Pappas's firing, it need not rely on the alleged differential treatment that Pappas received as opposed to his Latin American colleagues to deny XP Brazil's motion to dismiss. *See* SAC ¶ 43.

here, XP US's and XP Brazil's shifting perspective on whether Pappas was fired for performance-related reasons makes Pappas's theory that he was fired because of his age and national origin more likely. Of course, this evidence may not be enough to prove Pappas's case. But at this stage, that is not his burden; instead, he need only plausibly "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation" for his termination. *Littlejohn*, 795 F.3d at 311. He has done so.[9]

## IV. CONCLUSION

For the reasons described above, Defendants' motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 53.

SO ORDERED.

Dated: January 18, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[9] XP Brazil asks the Court to "reject" Pappas's damages claims concerning repurchase of shares as unrecoverable under the NYCHRL. *See* Def's Mem. at 21. But as Pappas notes, a motion to dismiss is "limited to contesting whether a complaint sufficiently states a legally cognizable claim." Pl's Opp. at 22. And the cases XP Brazil cites in support of its damages argument dismissed *claims*, not forms of relief, as duplicative of contract-based causes of action. *See* Reply at 10 (citing *Armstrong v. Eisenberg*, 2020 WL 526866, at *3 (S.D.N.Y. Feb. 3, 2020), and *Culwick v. Wood*, 2019 WL 9662658, at *7 (E.D.N.Y. June 4, 2019)). Accordingly, having determined that Pappas has stated a plausible claim for relief under the NYCHRL, the Court declines to evaluate what measure of damages are available to him at this time should he ultimately succeed on his claim.